# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## NORTHERN DIVISION
## AT ASHLAND

**CRIMINAL ACTION NO. 17-5-DLB-EBA**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**V.**                                    **MEMORANDUM OPINION AND ORDER**

**KELSEY L. BLACKABY, et al.**                                          **DEFENDANTS**

* *   * *   * *   * *   * *   * *   * *   * *

This matter is before the Court upon Defendants Kelsey L. Blackaby's and Kyle A. Ruark's Motions to Suppress. (Docs. # 30 and 31). Defendants' Motions were referred to Magistrate Judge Edward B. Atkins for the preparation of a Report and Recommendation ("R&R"). The R&R recommends that Defendant Blackaby's Motion to Suppress be granted in part and denied in part, and that Defendant Ruark's Motion be denied in full. (Doc. # 51). Defendant Ruark filed Objections to the R&R (Doc. # 57), which Defendant Blackaby has joined. (Docs. # 65 and 66). The Government having responded to the Defendants' Objections (Doc. # 68), and the Court having held oral argument on February 12, 2018, (Doc. # 70), the Motions are ripe for the Court's review. For the reasons that follow, the objections are **sustained** and the Motions to Suppress (Docs. # 30 and 31) are **granted**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

On May 4, 2016, Officer Bryan Tackett, a patrol officer and school-resource officer with the Flatwoods Police Department, received an anonymous tip that a six-year-old child, the son of Kelsey Blackaby, had been smacked in the face. (Doc. # 45 at 4:10-22).

After speaking with the child and investigating the matter, Officer Tackett obtained arrest warrants for Kelsey Blackaby and her then-boyfriend, Kyle Ruark, for assault in the fourth-degree, child abuse. *Id.* at 5:1-12. With the warrants in hand, Officer Tackett, Flatwoods Police Officer Justin Stevens, and representatives from Social Services traveled to Blackaby and Ruark's residence. *Id.* at 53:7-15. When they arrived at the residence, nobody was home. *Id.* at 5:20-23. The officers and the social workers waited outside for Defendants to return. *Id.*

Shortly thereafter, the Defendants returned home and were approached by the officers. *Id.* at 5:23-6:3. During the initial encounter, Defendants were not advised that there were warrants for their arrest. *Id.* at 68:1-3. However, the officers testified that the Defendants were not free to leave. *Id.* at 18:23-19:3. The officers explained that they were there for an "investigation of child abuse." *Id.* at 32:25-33:1. Although Officer Tackett knew both Defendants, he asked them to produce their identification. *Id.* at 6:13-15; 18:18-22; 33:2, 16-23. Ruark indicated that his identification was inside the residence and then entered his home to retrieve it.[1] *Id.* at 33:20-23. Officers Tackett and Stevens followed Ruark and Blackaby into their residence. *Id.* at 36:20; 43:19-22. At no point did either officer ask Blackaby or Ruark for consent to enter the home. *Id.* at 33:24-34:9; 91:11-15; 98:1-5.

While Blackaby retrieved her identification, Ruark immediately proceeded to the back bedroom. *Id.* at 7:3-8. Officer Stevens followed behind Ruark. *Id.* at 7:10-14; 34:11-13; 53:17-18; 56:1-2. As he reached the back bedroom, Ruark attempted to shut the door, but Officer Stevens prevented him from doing so. *Id.* at 34:18-24; 76:24-77:8; 92:9-

---

[1] There is also testimony indicating that the social workers requested a pill count, to confirm that the Blackaby and Ruark were taking their medications as prescribed. (Doc. # 45 at 75:12-17).

18. After Officer Stevens prevented Ruark from closing the door and opened it, Officer Stevens observed drug paraphernalia in the bedroom. *Id.* at 77:4-10.

When Ruark attempted to close the door on Officer Stevens, Officer Tackett testified that Ruark "kind of got smart" and was arrested on the assault warrant, removed from the home, and detained in a police cruiser. *Id.* at 6:16-21; 7:21-8:2; 93:8-13. Officer Tackett and Officer Stevens then requested and obtained consent to search the home from Blackaby. *Id.* at 8:4-9. During the search, Officer Tackett transported Ruark to Our Lady of Bellefonte Hospital in Ashland, Kentucky, for a DUI blood draw, and then brought him back to the residence. *Id.* at 10:16-11:7. As a result of that search, the officers found drug paraphernalia, as well as a marijuana grow and ammunition in the closet of the back bedroom. *Id.* at 58:6-18; 59:2-9. Once the search was completed, Blackaby was taken into custody. *Id.* at 59:13-15.

Ruark and Blackaby were then taken to the Flatwoods Police Department, where officers conducted custodial interrogations. *Id.* at 60:15-61:18. Although Ruark received *Miranda* warnings, Blackaby did not.[2] *Id.* at 45:23-46:16; 60:23-61:10; 102:7-9. During their interrogations at the police department—which were not recorded, videotaped, or summarized in any report—both Ruark and Blackaby signed forms consenting to the search of their residence at Officer Stevens's request. *Id.* at 12:1-12; 60:1-12; 60:25-61:7. Blackaby's consent-to-search form had the word "phone" scratched out.[3] *Id.* at 62:18-63:12. After signing the consent-to-search form, Ruark went back to the residence

---

[2]      Because of the officers' failure to *Mirandize* Blackaby, the Government has disclaimed any intention to introduce evidence of statements that Blackaby made to law-enforcement personnel during her post-arrest interview. (Doc. # 50 at 10).

[3]      The Government has also disclaimed any intention to introduce evidence obtained from the cell phone. (Doc. # 50 at 10).

with Officer Stevens and led him to the requested, incriminating items—namely, the ammunition, magazines, and a drum. *Id.* at 61:22-62:8. After assisting in this search of the residence, Ruark was returned to custody. *Id.* at 97:16-19.

On February 9, 2017, Blackaby and Ruark were indicted by a federal grand jury. (Doc. # 1). The Indictment alleges that Blackaby, then being an unlawful user of a controlled substance, illegally possessed a firearm and ammunition in violation of 18 U.S.C. § 922(g)(3). *Id.* at 1-2. As to Ruark, the Indictment alleges that he, a convicted felon and an unlawful user of a controlled substance, illegally possessed a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and (g)(3). *Id.* at 2. The Indictment also contains a forfeiture allegation. *Id.* at 2-3.

On June 29, 2017, Blackaby and Ruark filed Motions to Suppress. (Docs. # 30 and 31). After the Government filed its response (Doc. # 36), Magistrate Judge Atkins held an evidentiary hearing. (Doc. # 42). Following the evidentiary hearing, the parties submitted supplemental briefing. (Docs. # 46, 47, and 50). On October 30, 2017, Magistrate Judge Atkins filed an R&R (Doc. # 51), wherein he recommended that Defendant Blackaby's Motion to Suppress (Doc. # 30) be granted insofar as she seeks the suppression of evidence gained from her cell phone or statements made by her following her arrest without *Miranda* warnings, which the Government has indicated it does not intend to use as evidence in its case-in-chief.[4] (Doc. # 50 at 10). However, the R&R recommends that Blackaby's Motion to Suppress be denied in all other respects. (Doc. # 51). Similarly, the R&R recommends that Defendant Ruark's Motion to Suppress (Doc. # 31) be denied in its entirety. (Doc. # 51). On February 12, 2018, this Court held

---

[4]     Because neither party has objected to the R&R's recommendation to suppress evidence gained from Blackaby's cell phone or her post-arrest statements, that portion of the R&R is **adopted**.

oral argument on the Motions.  (Doc. # 70).  This matter is now ripe before the Court upon Defendants' Objections to the R&R.  (Docs. # 57 and 65).

## II.    ANALYSIS

### A.    Standard of Review

The Court reviews *de novo* those portions of the R&R to which Defendants have specifically objected.  28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3).  Because Defendants' objections take issue with the R&R at every turn, the Court's analysis will track the R&R's discussion of the Motions to Suppress.

### B.    The officers entered the Defendants' home without a warrant.

"The Fourth Amendment, which applies to the states through incorporation by the Fourteenth Amendment, protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  *Stricker v. Twp. of Cambridge*, 710 F.3d 350, 358 (6th Cir. 2013) (citing U.S. Const. amend. IV). "The home is afforded the greatest amount of protection."  *Id.*  And "searches and seizures inside a home without a warrant are presumptively unreasonable."  *Payton v. New York*, 445 U.S. 573, 586 (1980).  "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions."  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

### C.    Defendants did not impliedly consent to the officers' initial entry into the home.

One exception to the warrant requirement is "a search that is conducted pursuant to consent."[5]  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (citing *Davis v.*

---

[5]    On one thing, the Government, the Defendants, and the R&R are all in agreement: The officers' entry into the Defendants' home was not a lawful "protective sweep" incident to an arrest under *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  (Doc. # 51 at 6).

*United States*, 328 U.S. 582, 593-94 (1946)).  "Consent to enter need not be explicit." *Smith v. City of Wyoming*, 821 F.3d 697, 709 (6th Cir. 2016).  It "may be given in the form of words, gesture or conduct."  *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (en banc).  "In whatever form, consent has effect only if it is given freely and voluntarily." *Id.* (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).  But, consent "is not lightly to be inferred," *Simmons v. Bomar*, 349 F.2d 365, 366 (6th Cir. 1965), and a search based on consent requires more than "an expression of futility in resistance to authority or acquiescing in the officers' request."  *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999).  The Government bears the burden of proving, "by clear and positive testimony," that the officers had consent to enter the residence.  *United States v. McCaleb*, 552 F.2d 717, 721 (6th Cir. 1977) (citing *Amos v. United States*, 255 U.S. 313 (1921)).

Here, it is undisputed that neither Officer Tackett nor Officer Stevens asked for permission to enter the Defendants' home.  (Doc. # 45 at 33:24-34:9; 91:11-15; 98:1-5). Rather, in response to and in compliance with the officers' demand for the Defendants' identification and the social workers' request for a "pill count," Defendants walked into their home to retrieve the requested items.  *Id.* at 6:13-15; 18:18-22; 33:2, 16-23; 75:12-17.  The officers simply followed behind them.  *Id.* at 36:20; 43:19-22.

The Government argues that the Defendants impliedly consented to the officers' entry into their home, focusing on the fact that officers did not have weapons drawn and the Defendants' failure to object to the officers' presence.  (Doc. # 50 at 5-6).  By contrast, the Defendants claim that the officers did not have consent to enter their home and that mere acquiescence to the officers' entry does not constitute valid consent to enter or

search the premises. (Docs. # 46 at 7-9; 47 at 3). The Court agrees with the Defendants on this point.

The R&R concluded that the "Defendants knowingly and voluntarily permitted the officers to enter their residence" and that such "action may not now be undone." (Doc. # 51 at 9). To support that finding, the R&R pointed to the officers' testimony that they "believed they had consent to enter" and the Defendants' failure to "provide[ ] evidence of any objection to the officers' entry into their residence" or "evidence of coercion or duress." *Id.* at 6-7. Additionally, the R&R relied on the Sixth Circuit's decision in *Carter*. *Id.* at 8-9.

The Defendants' objections to the R&R's finding of implied consent are well taken. First, a "determination of consent to enter must be "judged against an objective standard." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990). The proper inquiry, therefore, is: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The question is not whether the officers *believed* they had consent to enter, and the officers' subjective beliefs about their permission to enter the Defendants' home are irrelevant. Thus, in this respect, the R&R, which appears to apply a subjective, rather than an objective, standard, is unsound.

Second, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntary given" and "[t]his burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper*, 391 U.S. at 548-49. Because the Government bears the burden of proof, the R&R's repeated mentions of the Defendants'

failure to produce evidence—regarding their failure to object to the officers' entry, their lack of knowledge of their ability to refuse consent, or any coercion or duress—indicate an improper focus. It is not the Defendants' burden to establish that they did not provide consent; it is the Government's burden to prove that they did.

Third, and most importantly, the R&R's reliance on *Carter* is misplaced. In *Carter*, officers knocked on the door of the defendant's hotel room. After the defendant opened the door, "the officers asked Carter if they could enter the hotel room and speak to him." *Carter*, 378 F.3d at 587. "In response, Carter stepped back and cleared a path for the officers to enter." *Id.* On these facts, the Sixth Circuit found that the defendant had impliedly consented to the officers' entry into his hotel room. *Id.* at 588.

The R&R analogized the present case to *Carter*. There are, however, significant factual differences between *Carter* and this case—namely, the defendants were not inside their home when they were first approached by the officers and the officers did not ask for permission to enter. These very differences led the Sixth Circuit to distinguish *Carter* and reach a contrary conclusion in *United States v. Little*, 431 F. App'x 417 (6th Cir. 2011).

In *Little*, the officer made contact with the defendant on the front porch of his mother's home. *Id.* at 418. After the officer indicated a desire to speak with the defendant at the police department, the defendant "asked if he could put on a shirt." *Id.* The officer "agreed and followed defendant into the house without asking permission to enter." *Id.* In reversing the district court's denial of defendant's motion to suppress, the Sixth Circuit held that the officer's entry into the home violated the Fourth Amendment and required suppression of the "evidence acquired as a result of that unlawful entry." *Id.* at 420-21.

Although the defendant in *Little* was cooperative and raised no objection when the officer followed him inside, the Sixth Circuit rejected the argument that the defendant had impliedly consented to the officer's entry into the home:

> Had Officer Harper asked for permission to enter and had defendant behaved in the same manner, we would have no difficulty in affirming the district court's finding of implied consent. Unfortunately, [Officer] Harper neglected to do so and logic dictates that a person cannot consent to a request that has not been made—particularly in light of the fact that the government bears the burden of showing that consent was given voluntarily.

*Id.* at 420.

The Court recognizes that *Little* is an unpublished case, and thus, not precedentially binding under the doctrine of stare decisis. *United States v. Sanford*, 476 F.3d 391, 396 (6th Cir. 2007). Nevertheless, the Court finds *Little* and its logic highly persuasive. The United States argues that any reliance on *Little* is "misplaced" because the decision is unreasonable and contrary to Supreme Court precedent. (Doc. # 68 at 7). That argument fails to convince the Court to look past *Little*.

The Sixth Circuit's holding in *Little* is not incompatible with Supreme Court precedent, which holds that the voluntariness of a person's consent to search "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. In *Little*, the Sixth Circuit was considering whether consent had been given at all, not whether the defendant's consent was voluntary. The *Little* Court acknowledged that the Sixth Circuit had "not considered whether the totality of the circumstances can ever support a finding of implied consent in the absence of an explicit request for permission" and stopped short of answering that question. *Little*, 431 F. App'x at 420. The Sixth Circuit did, however, join the Eleventh Circuit and hold that "consent cannot be inferred by the simple act of disengaging from conversation with an officer and

walking into the house." *Id.* (citing *Bashir v. Rockdale Cty., Ga.*, 445 F.3d 1323, 1329 (11th Cir. 2006)).

The Court's reliance on *Little* is further supported by *United States v. Harvey*, 901 F. Supp. 2d 681 (N.D. W. Va. 2012)—a published case from the Northern District of West Virginia with strikingly similar facts. In *Harvey*, the officer conducted a lawful traffic stop in front of the defendant's home. *Id.* at 685, 690. During the traffic stop, the officer asked the defendant for his name and date of birth. *Id.* at 690. When dispatch could not return an individual with defendant's name and date of birth, the defendant informed the officer that his identification was inside the residence. *Id.* The defendant then entered his home, escorted by the officer. *Id.* The officer did not ask for permission to enter and the defendant did not object to the officer accompanying him. *Id.* The Northern District of West Virginia rejected the argument that the defendant had impliedly consented to the officer's entry into his home and found that the defendant's "silence and lack of resistance in response to" the officer's "accompaniment evince[d], at most a mere acquiescence to a show of lawful authority":

> In the absence of any gestures or conduct that could reasonably be construed as consent, [the defendant's] implied consent would have to be premised exclusively on his silence and lack of resistance to [the officer's] actions. Notably, the government has cited to no case stating that consent to search can, in the first instance, be inferred solely from the silence of a defendant who was never asked. Rather, the weight of the authority holds that "'the government may not show consent to enter from the defendant's failure to object to the entry. To do so would be to justify entry by consent and consent by entry.'"

*Id.* at 694-95 (quoting *United States v. Gonzalez*, 71 F.3d 819, 830 (11th Cir. 1996) (quoting *United States v. Shaibu*, 920 F.2d 1423, 1427 (9th Cir. 1990)) (and citing *Little*,

431 F. App'x 471; *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 402 (5th Cir. 2002)).

Put simply, the instant case and *Little* are one and the same. *Carter*, on the other hand, is easily distinguishable. It is undisputed that neither Officer Tackett nor Officer Stevens asked the Defendants for permission to enter the home. Instead, the officers merely followed the Defendants into their home after asking them to retrieve their identification and produce prescriptions for a pill count. That the officers were wearing uniforms and did not have weapons drawn does not convince the Court that the Defendants consented to the officers' entry. And, as the Sixth Circuit held in *Little*, without a request, the Defendants' cooperative nature and failure to expressly object does not compel the conclusion that the Defendants consented to the officers' entry. Again, "[i]t is the Government's burden by a preponderance of the evidence, to show through 'clear and positive' testimony that valid consent was obtained." *United States v. Hinojosa*, 606 F.3d 875, 881 (6th Cir. 2010). The Government has failed to carry that burden.

**D. Assuming *arguendo* that Defendants did consent to the officers' entry, that consent was revoked.**

Even assuming that the Defendants impliedly consented to the officers' initial entry into their home, a "consenting party may limit the scope of that search, and hence at any moment may retract his consent." *Painter v. Robertson*, 185 F.3d 557, at 567 (6th Cir. 1999) (citing *Jimeno*, 500 U.S. at 251-52). "[U]pon such a revocation, a previously valid consensual search 'should be terminated instantly' and 'the officers should … promptly depart the premises (assuming they possess no independent legal authority to remain).'" *United States v. Tatman*, 397 F. App'x 152, 163 (6th Cir. 2010) (quoting *Painter*, 185 F.3d at 567) (internal modifications omitted). Like the initial consent analysis, the "standard for

measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness." *Jimeno*, 500 U.S. at 251.

There can be no dispute that Ruark's retreat to his bedroom and attempt to close the door was an unequivocal revocation of any consent that may have existed. In fact, the Sixth Circuit has held just that—a defendant's "attempt to close the door constitute[s] a termination of the consensual encounter, and communicate[s] his lack of consent to any further intrusion by the officers." *Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2005). This is so even when the defendant is "prevented from doing so by the presence of [the officer's] foot" or hand "in the doorway." *Id.*

Accordingly, the R&R's determination that Officer Stevens's "inadvertent viewing of drug paraphernalia in the bedroom in plain view through the doorway was lawful" cannot be supported. (Doc. # 51 at 11) First, Officer Stevens's viewing of the drug paraphernalia was hardly "inadvertent." The testimony at the evidentiary hearing establishes that Officer Stevens intentionally prevented Ruark from shutting the door. (Doc. # 45 at 92:14-18). Second, the "plain-view" exception does not excuse the officers' lack of a warrant or consent. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). But, four factors must be satisfied in order for the plain-view doctrine to apply: "(1) the object must be in plain view; (2) the officer must be legally present in the place from which the object can be plainly seen; (3) the object's incriminating nature must be immediately apparent; and (4) the officer must have a right of access to the object." *United States v. Garcia*, 496 F.3d 495, 508 (6th Cir. 2007) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)).

Because Officer Stevens was not lawfully present in the place from which the drug paraphernalia could be seen—the bedroom's entryway—the second element of the plain-view doctrine is not satisfied. As explained above, the officers' initial entry into the Defendants' home was not consensual. Moreover, even assuming that the initial entry was consensual, that consent was revoked before Officer Stevens observed the drug paraphernalia in "plain view." At the evidentiary hearing, Officer Stevens testified that it was only once he prevented Ruark from shutting the door and opened it, that he saw the drug paraphernalia. (Doc. # 45 at 76:24-77:10). Accordingly, the R&R's reliance on the plain-view doctrine is mistaken.

Nor can the Government rely on the exigent-circumstances exception to legitimize the warrantless and non-consensual search, as the R&R suggests. (Doc. # 51 at 11 n.1) ("It is also notable that—although such circumstances may not control here—some element of exigency may have justified Officer Stevens'[s] actions. Although not under arrest, Defendant Ruark was not free to leave. Officer Stevens would likely have been justified in following Defendant Ruark to the bedroom on this basis alone. Once Officer Stevens saw the drug paraphernalia in plain view, he may also have had an interest in preventing said paraphernalia's destruction."). Although "the need to prevent the imminent destruction of evidence is a sufficient justification for a warrantless search," any exigency that existed was police-created. *Kentucky v. King*, 563 U.S. 452, 460 (2011) (citing *Brigham City*, 547 U.S. at 403). Without the officers' unlawful entry into the home, there would have been no need for imminent destruction of evidence. And the exigent-circumstances exception applies only "when the police do not gain entry to premises by means of an actual or threatened violation of the Fourth Amendment." *Id.* at 469.

Because the officers' initial entry into the home—or alternatively, Officer Stevens's actions in exceeding the scope of the Defendants' implied consent—violated the Fourth Amendment, the exigent-circumstances exception does not apply.

### E. Defendant Kelsey Blackaby's consent to search was not effective as to Defendant Kyle Ruark.

Having determined that the officers' initial entry was non-consensual and violated the Fourth Amendment, the Court must next determine whether Blackaby's subsequent consent to search was valid.

"[C]onsent by one resident of jointly occupied premises is generally sufficient to justify a warrantless search." *Fernandez v. California*, 134 S. Ct. 1126, 1134 (2014). There is, however, a narrow exception to that rule: the consent of one occupant is insufficient when another occupant is present and objects to the search. *Georgia v. Randolph*, 547 U.S. 103 (2006). In crafting this exception, the Supreme Court recognized it was "drawing a fine line":

> This is the line we draw, and we think the formalism is justified. So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenants permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

*Randolph*, 547 U.S. at 121-22.

At first glance, this case appears to fall squarely within the *Randolph* exception. Ruark, while physically present at the residence, objected to the officers' search of the bedroom. Once Ruark lodged his objection, he was arrested and removed from the residence, and detained in a police cruiser outside. Immediately thereafter, the officers requested and obtained consent to search from Blackaby. But, the R&R relied on a more

recent Supreme Court case—*Fernandez v. California*—and determined that the *Randolph* exception does not apply. (Docs. # 51 at 12).

In *Fernandez*, police sought to enter an apartment shared by the defendant and his girlfriend, but the defendant objected. *Fernandez*, 134 S. Ct. at 1130. The police then lawfully arrested the defendant and took him to the police station for booking. *Id.* Approximately one hour later, the police returned to the residence, obtained consent to search the apartment from the cotenant-girlfriend, and discovered various pieces of incriminating evidence later used against the defendant. *Id.* at 1130-31.

The *Fernandez* Court rejected *Randolph*'s suggestion that "evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection" could vitiate an otherwise lawful consent by a cotenant. *Id.* at 1134. The Court explained that the "*Randolph* dictum is best understood not to require an inquiry into the subjective intent of officers who detain or arrest a potential objector but instead to refer to situations in which the removal of the potential objector is not objectively reasonable." *Id.* Limiting *Randolph*'s holding, the Court held that "an occupant who is absent due to a lawful detention or arrest stands in the same shoes as an occupant who is absent for any other reason."[6] *Id.*

The *Fernandez* Court then briefly addressed the presence requirement and recognized that if "*Randolph* requires presence on the premises to be searched, there may be cases in which the outer boundary of the premises is disputed." *Id.* at 1136. Despite these practical issues, the Court determined that "a premises rule is workable in [this] context." *Id.* In support of that conclusion, the Supreme Court highlighted *Bailey v.*

---

[6] The Defendants have not challenged the lawfulness of Ruark's arrest.

*United States*, where the Court "confronted a similar problem" and "adopted a rule that applies only when the affected individual is near the premises being searched." *Id.* (citing *Bailey*, 568 U.S. 186 (2013) (defining the geographic parameters of officers' authority to detain individuals while executing a search warrant and limiting such area to "the immediate vicinity of the premises")).

The R&R determined that the *Randolph* exception does not apply because Ruark was "outside" when Blackaby executed the consent-to-search form. (Docs. # 51 at 12). A review of *Fernandez*, however, reveals that the objecting cotenant is not required to be *inside* the home, but rather, must be "*near* the premises being searched." *Fernandez*, 134 S. Ct. at 1136 (emphasis added). The preposition is important. Had the Supreme Court wanted to confine the exception to objectors inside the home, it could have done so. Or, it could have, as it often does in the Fourth Amendment context, confine the exception to the curtilage of the home. Instead, the Supreme Court required only that the objector be "near the premises being searched" to be "present."

Therefore, *Fernandez* does not resolve the issue, but instead, gives rise to an additional question. Was Ruark "present" when officers sought to obtain consent from Blackaby and override Ruark's objection? In the simplest of terms, the answer is yes.

The transcript of the evidentiary hearing establishes that Ruark was a "present and objecting cotenant" when Blackaby gave consent to search. *Randolph*, 547 U.S. at 119. Ruark objected to a search of his home when he attempted to shut the door on Officer Stevens. Unlike the arrested cotenant in *Fernandez*, who was taken to the police station, Ruark was arrested and detained in Officer Tackett's police cruiser near the premises being searched. (Doc. # 45 at 7:21-25; 82:7-83:10). Although it is unclear from the record

where Officer Tackett's cruiser was parked—two of the three cruisers were parked on the street directly in front of the Defendants' home and the third cruiser was parked in a neighbor's driveway—it is clear that Ruark was near the premises being searched. *Id.* at 30:5-8; *see also United States v. Allen*, No. 16-cr-20239, 2018 WL 624110, at *4 (W.D. Tenn. Jan. 30, 2018) ("Although Allen was lawfully detained in a squad car while [cotenant] consented to the search, he was near the searched premises."). After putting Ruark in his cruiser, Officer Tackett immediately reentered the residence and requested consent to search from Blackaby.[7] *Id.* at 7:25-8:9.

Accordingly, Blackaby's consent to search was invalid. The officers' "warrantless search of [the Defendants'] shared dwelling … over the express refusal of consent by" Ruark, a physically present resident, "cannot be justified as reasonable as to him on the basis of consent given to the police by" Blackaby, "another resident." *Randolph*, 547 U.S. at 120.

### F. Defendant Kelsey Blackaby's consent to search was not freely and voluntarily given.

"Consent is voluntary when it is 'unequivocal, specific, and intelligently given, uncontaminated by any duress or coercion.'" *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) (quoting *United States v. Moon*, 513 F.3d 527, 537 (6th Cir. 2008)). "Voluntariness is determined by examining the totality of the circumstances." *Id.* at 571-

---

[7]     Testimony at the evidentiary hearing established that, at some point during the search, Officer Tackett transported Ruark to Our Lady of Bellefonte Hospital in Ashland, Kentucky, for a DUI blood draw. (Doc. # 45 at 10:16-11:7). However, that fact is of no consequence because Ruark was present and objecting at the critical time—when the officers sought Blackaby's consent to search the home.
        Additionally, the hearing testimony established that Officer Tackett brought Ruark back to the residence before the search was completed. *Id.* In *Fernandez*, the Supreme Court indicated that a defendant's potential return to the home could be relevant. *Fernandez*, 134 S. Ct. at 1135 ("But when the objector is not on the scene (and especially when it is known that the objector will not return during the course of the visit), the friend or visitor is much more likely to accept the invitation to enter.").

72. "Several factors should be examined in the consent calculus." *Id.* at 572. "First, a court should examine the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights." *Id.* (citing *United States v. Jones*, 846 F.2d 358, 360 (6th Cir. 1988)). "While the police do not have to inform an individual of his right to refuse, the absence of such a warning is considered in the totality of the circumstances analysis." *Id.* "Second, a court should consider the details of the detention, including the length and nature of detention, the use of coercive or punishing conduct by the police, and indications of more subtle forms of coercion that might flaw an individual's judgment." *Id.* (internal citations omitted).

The characteristics of the accused do not suggest that Blackaby was incapable of providing voluntary consent. As the R&R noted, Blackaby "is an adult presumably of ordinary intelligence." (Doc. # 51 at 13). And, the consent-to-search form Blackaby signed included a sentence that informed her of her right to refuse consent. (Doc. # 43, Gov. Ex. 1). But, "knowledge of the right to refuse consent is" simply one factor "to be taken into account," and in this case, the Court does not "find the inclusion of this statement in the … standard consent form alone to be particularly persuasive in light of the surrounding circumstances." *Tatman*, 397 F. App'x at 165 (internal citations omitted).

It is undisputed that Blackaby was not free to leave, despite the fact that she had not been formally arrested. (Doc. # 45 at 18:23-25). Thus, while not dispositive, the details of Blackaby's detention indicate a form of coercion. *United States v. Watson*, 423 U.S. 411, 424 (1976) ("[T]he fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search.").

Additionally, the Court finds that there were "more subtle forms of coercion" at play. *Moon*, 513 F.3d at 537. And, "no matter how subtly the coercion [is] applied, the resulting 'consent' [is] no more than a pretext for the unjustified police intrusion," which the Constitution prohibits. *Schneckloth*, 415 U.S. at 228. Blackaby was in the home when Ruark attempted to close the bedroom door on Officer Stevens and prevent him from entering the bedroom, only minutes before she signed the consent form. "[I]ntervening between" those events, Blackaby saw Ruark be "led outside by police," handcuffed, "and placed in the back of a police cruiser." *Tatman*, 397 F. App'x at 166. The Sixth Circuit has recognized that "[c]ultivating someone's fear of criminal prosecution" is "an example of a more subtle form of coercion that might flaw an individual's judgment." *Id.* (internal citations and alterations omitted). Although she did not testify at the suppression hearing, as a witness to Ruark's arrest, Blackaby could have believed a similar fate awaited her, if she refused to consent.

The R&R determined that there was "an absence of evidence tending to show that Defendant Blackaby['s] consent to search the residence was tainted by duress, coercion, or some other abuse." (Doc. # 51 at 13). This Court, however, is not convinced that Blackaby's consent was freely and voluntarily given. The "circumstances surrounding the search" and Blackaby's consent evince "more subtle forms of coercion that might flaw an individual's judgment." *Moon*, 513 F.3d at 537 (internal citations and alterations omitted).

Moreover, because the R&R erroneously concluded that the initial entry into the home was consensual, and that the initial search of the bedroom was permissible under the plain-view doctrine, the R&R did not have occasion to consider the taint of the illegal entry and the illegal search on Blackaby's subsequent consent.

19

"The consequence of 'an illegal entry is to make unlawful any ensuing interrogations or searches.'" *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990) (citing *United Sates v. Vasquez*, 638 F.2d 507, 527 (2d Cir. 1980)). "Suppression is required of any items seized during the search of the house, unless the taint of the initial entry has been dissipated before the 'consents' to search were given." *Id.* (quoting *Vasequez*, 638 F.2d at 527). Therefore, courts cannot consider the subsequent consent in a vacuum; instead, courts must "evaluate the final, written consent to determine whether, under the whole scenario from" initial contact with the defendant "to search, that consent was voluntary and unequivocal." *United States v. Buckingham*, 433 F.3d 508, 514 (6th Cir. 2006).

When the Government seeks to legitimize a search with "consent follow[ing] an illegal search, the Government must demonstrate that the 'consent was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion.'" *United States v. Haynes*, 301 F.3d 669, 682 (6th Cir. 2002) (quoting *Buchanan*, 904 F.2d at 355). In other words, the burden for proving that a defendant freely and voluntary consented to a search is heavier after there has been an unconstitutional entry or search. In this case, the Government has failed to satisfy that burden.

"Dissipation of the taint resulting from an illegal entry 'ordinarily involves showing that there was some significant intervening time, space, or event.'" *Buchanan*, 904 F.2d at 356. "Under some circumstances, a voluntary consent to search is an event that may remove the taint of a prior illegal search." *Haynes*, 301 F.3d at 382. "To determine whether a consent to search was sufficiently attenuated from an illegal [entry, search, or seizure] such that the causal chain was broken, courts must consider factors such as the

length of time between the illegal [conduct] and the consent, the presence of intervening circumstances, the purpose and flagrancy of the official misconduct, and whether the officers read the suspect his *Miranda* rights before he consented." *United States v. Lopez-Arias*, 344 F.3d 623, 630 (2003) (citing *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)). No single factor in the attenuation analysis is dispositive. *Beauchamp*, 659 F.3d at 573.

Here, the record reveals that the taint had not dissipated. As conceded by the United States during oral argument, mere minutes passed between the officers' illegal entry and the officers' request that Blackaby consent to a search. (Doc. # 45 at 7:25-8:9; 86:16-87:17). Thus, the intervening time between the illegal entry and Blackaby's consent was insignificant. *See, e.g.*, *Buchanan*, 904 F.2d at 356 (finding the passage of one hour was inconsequential). There was no intervening event of significance either. In fact, the events that occurred between the time of the illegal entry and the time Blackaby signed the consent form—Ruark's attempt to close the door, Officer Stevens's refusal to allow him to do so, and Ruark's arrest—suggest that rather than dissipate, the taint increased.

Accordingly, the facts do not demonstrate by clear and positive testimony that Blackaby's alleged consent was sufficiently voluntary so as to remove the taint of the prior illegal entry into her home and the prior illegal search of the bedroom. Although the consent-to-search form that Blackaby signed informed her of the right to refuse consent to search, (Doc. # 43, Gov. Ex. 1), she was not given *Miranda* warnings. (Doc. # 45 at 46:23-47:5). Given the rapid succession of events from the Defendants' initial encounter with the officers and the social workers, the officers' illegal entry into Defendants' home, Officer Stevens's unlawful search of the bedroom, and Ruark's arrest, the Government

has not proven that Blackaby's consent was sufficiently an act of free will to purge the taint of the prior illegal entry and illegal search.

### G. Defendants' post-arrest consents to search were not freely and voluntarily given.

The Government also attempts to rely on the Defendants' signing of consent-to-search forms after they were arrested and subjected to custodial interrogations at the Russell, Kentucky police station. (Docs. # 50 at 9; 68 at 13). The R&R accepted this argument and found that the final warrantless search of the residence was constitutional. (Doc. # 51 at 14-15). For much the same reasons as Blackaby's first consent to search was invalid, the Defendants' post-arrest consents to search are also invalid.[8]

As the Court recognized above, "[u]nder some circumstances, a voluntary consent to search is an event that may remove the taint of a prior illegal search." *Haynes*, 301 F.3d at 382. But, to dissipate the taint of the officers' illegal entry and illegal search, Blackaby's and Ruark's consent to search must be sufficiently attenuated such that the causal chain was broken. *Lopez-Arias*, 344 F.3d at 530. Simply put, the causal chain had not been broken, and the taint of the prior constitutional violations remained.

While the temporal proximity between the illegal entry and search and the Defendants' consents decreased, the events that transpired in the meantime—the Defendants witnessing the incriminating results of the search, Blackaby's arrest, the Defendants' transport to the police station, and the ensuing lengthy custodial

---

[8] In addition to the prior illegal entry and illegal search, there is another hurdle to relying on Ruark's post-arrest consent to search. The Sixth Circuit has held that a "consent is suspect if given by one who earlier refused to consent, unless some reason appears to explain the change in position." *Buckingham*, 433 F.3d at 514. Here, the only explanation for Ruark's change in position is futility. The police had already searched his home and discovered incriminating evidence.

interrogations[9]—did not dissipate the taint.  *See, e.g.*, *Taylor v. Alabama*, 457 U.S. 687, 691 (1982) (finding no attenuation when the interval between the illegal arrest and confession was six hours, explaining "a difference of a few hours is not significant where, as here, petitioner was in police custody, unrepresented by counsel, and he was questioned on several occasions, fingerprinted, and subjected to a lineup.").

The Government has not proven that there was an "intervening act of free will" on the part of the Defendants between the constitutional violations and the Defendants' consent.  *Lopez-Arias*, 344 F.3d at 630.  The officers never informed Blackaby of her *Miranda* rights.  (Doc. # 45 at 46:23-47:5).  Although the officers informed Ruark of his *Miranda* rights, (Doc. # 43, Gov. Ex. 4), "this alone [is] insufficient to break the causal chain" between the illegal entry and search and his consent.  *Lopez-Arias*, 344 F.3d at 630 (citing *Kaupp*, 538 U.S. at 633) (holding that the giving of *Miranda* warnings alone was insufficient to purge the primary taint of the unlawful seizure)).

Furthermore, a "suspect's knowledge of a prior illegal search can also give rise to a sense of futility."  *Haynes*, 301 F.3d at 683.  After witnessing the officers' illegal entry, Officer Stevens's unlawful search of the bedroom that discovered drug paraphernalia, the invalid and involuntary consent of Blackaby that led to the additional discovery of incriminating evidence, the Defendants "may have reasonably believed that the horse was already out of the barn."  *Id.* at 684.  As part of the totality of the circumstances, the Court finds that the prior illegal searches would have reasonably led the Defendants to believe that refusing consent to search was futile.

---

[9] The record reflects that Defendant Ruark was interviewed by several individuals at the police station over the course of several hours prior to signing his written consent form.

Therefore, the Government has not proven that either of Blackaby's or Ruark's post-arrest consents to search at the police station a few hours later were sufficiently an act of free will to purge the taint of the prior illegal entry and illegal search. Accordingly, the second search of the Defendants' residence was not consensual.

### H. The Exclusionary Rule requires suppression of the evidence.

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Herring v. United States*, 555 U.S. 135, 139 (2009) (citing *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). "Nonetheless, [Supreme Court] decisions establish an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Id.* (citing *Weeks v. United States*, 232 U.S. 383, 398 (1914)). "[T]his judicially created rule is 'designed to safeguard Fourth Amendment rights … through its deterrent effect.'" *Id.* at 139-40 (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).

The "exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)). "Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search"—the so-called "fruit of the poisonous tree." *Murray v. United States*, 487 U.S. 533, 536-37 (1988).

There are, however, several exceptions to the exclusionary rule. Two of those exceptions, which "involve the causal relationship between the unconstitutional act and the discovery of evidence," are relevant here. *Strieff*, 136 S. Ct. at 2061.

### i.    The Attenuation Doctrine

Under the attenuation doctrine, courts "need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *United States v. Fofana*, 666 F.3d 985, 992-93 (6th Cir. 2012). "Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting *Wong Sun*, 371 U.S. 487-88). Put another way, "evidence is admissible when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstances, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Strieff*, 136 S. Ct. at 2061 (quoting *Hudson v. Michigan*, 547 U.S. 586, 593 (2006)).

The Supreme Court has articulated three factors which guide the analysis: (1) temporal proximity between the constitutional conduct and the discovery of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and the flagrancy of the official misconduct. *Id.* at 2062. The Court has already determined that the Defendants' consents to search, which were executed after the initial illegal entry and illegal search, were not sufficiently attenuated as to dissipate the taint of the constitutional violations. *See supra* pp. 19-24. The Defendants' consents to search—all three of

them—were the fruit of the officers' illegal entry and Officer Stevens's illegal search. Therefore, the Government cannot rely on the attenuation doctrine to avoid the application of the exclusionary rule.

### ii.    The Inevitable-Discovery Doctrine

The inevitable-discovery doctrine "allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Strieff*, 136 S. Ct. at 2061 (citing *Nix v. Williams*, 467 U.S. 431, 447 (1984)).  That exception to the exclusionary rule "applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establish that the disputed evidence inevitably would have been discovered." *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008) (citing *Kennedy*, 61 F.3d at 499).  In effect, the inevitable-discovery doctrine avoids "put[ting] the police in a worse position than they would have been in absent any error or violation." *Nix*, 467 U.S. at 443.

The inevitable-discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Id.*  The burden of proof is on the Government "to establish that the tainted evidence would have been discovered by lawful means." *Id.* (internal citations omitted).

At the Court's request (Doc. # 60), the Government discussed the issue of inevitable discovery in its Response to Defendants' objections.  (Doc. # 68 at 14-17).  But, the only avenues that the Government suggests for the "inevitable discovery" of the unconstitutionally obtained evidence are the plain-sight doctrine and the exigent-

circumstances doctrine, which arose only after the officers' initial illegal entry into Defendants' home, and which the Court has already rejected as viable exceptions to the warrant requirement. *See supra* pp. 12-14. As such, the Government has failed to carry their burden and establish that the tainted evidence would have been discovered by lawful means. Therefore, the inevitable-discovery doctrine does not provide an exception to the application of the exclusionary rule in this case.

### iii.    The evidence must be suppressed.

"The fact that a Fourth Amendment violation occurred," however, "does not necessarily mean that the exclusionary rule applies." *Herring*, 555 U.S. at 140. "Indeed, exclusion 'has always been our last resort, not our first impulse.'" *Id.* (quoting *Hudson*, 547 U.S. at 591). Thus, there are "important principles that constrain application of the exclusionary rule." *Id.* "First, the exclusionary rule is not an individual right and applies only where it results in appreciable deterrence." *Id.* at 141 (internal citations and alterations omitted). "In addition, the benefits of deterrence must outweigh the costs." *Id.* "'[T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against the substantial social costs exacted by the exclusionary rule.'" *Id.* (quoting *Illinois v. Krull*, 480 U.S. 340, 352 (1987)). "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system." *Id.* (internal citations and quotation marks omitted). To "trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the judicial system." *Id.* at 144. Therefore, the Court must determine whether the deterrent benefits

outweigh the social costs of excluding the evidence of drug paraphernalia, marijuana grow, ammunition, magazines, and drum seized from the Defendants' home.

Here, that task is simple. The police misconduct that led to the discovery of the incriminating evidence—illegal entry and illegal search of the Defendants' home—is "sufficiently deliberate that the exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *United States v. Master*, 614 F.3d 236, 243 (6th Cir. 2010). This is not an instance where the police acted with an "objectively reasonable good-faith belief that their conduct [was] lawful" or where their "conduct involves only simple, isolated negligence." *Davis v. United States*, 564 U.S. 229 (2011). Therefore, all of the evidence discovered in the Defendants' home must be excluded and the Defendants' Motions to Suppress (Docs. # 30 and 31) are granted.

## III.  CONCLUSION

Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)     The Report and Recommendation of the United States Magistrate Judge (Doc. # 51) is hereby **adopted in part** and **rejected in part** as follows:

(a)     Insofar as the R&R recommends that the evidence obtained from Defendant Kelsey Blackaby's cell phone or statements made by her following her arrest without *Miranda* warnings it is **adopted** as the findings of fact and conclusions of law of the Court;

(b)     In all other respects, the R&R is **rejected**;

(2)     Defendants' Objections (Docs. # 65 and 66) are hereby **sustained** as set forth herein;

(3)     Defendants' Motions to Suppress (Doc. # 30 and 31) are hereby **granted in full**;

(4)     The time period between the filing of the motions to suppress and this Order, totaling 228 days, is **excluded** from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. 3161(h)(1)(D);

(5)     The United States shall file a Status Report, **within 20 days from the date of the entry of this Order**, advising the Court of its intentions in this matter and whether it intends to appeal the Court's decision granting Defendants' motions to suppress; and

(6)     A Hearing to set conditions of release for both Defendants is scheduled for **Thursday, February 15, 2018 at 9:30 a.m. in Ashland** before Magistrate Judge Atkins.

This 12th day of February, 2018.



Signed By:

*David L. Bunning*

United States District Judge

K:\DATA\ORDERS\Ashland Criminal\2017\17-5 Mtn to Suppress Order.docx